## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY
## NEWARK VICINAGE

| | | |
|---|---|---|
| STACY ZEIDERS and CALVIN WESTLUND, on behalf of themselves and all others similarly situated, | : | Case No.: |
| | : | |
| | : | |
| | : | |
| | : | **CLASS ACTION COMPLAINT** |
| Plaintiffs, | : | |
| v. | : | |
| | : | |
| VOLKSWAGEN GROUP OF AMERICA, INC., | : | **DEMAND FOR JURY TRIAL** |
| | : | |
| Defendant. | : | |
| | : | |

## PLAINTIFFS' CLASS ACTION COMPLAINT AND JURY DEMAND

Plaintiffs Stacy Zeiders and Calvin Westlund bring this action against Defendant Volkswagen Group of America, Inc. (hereafter, "Defendant" or "VW"), individually and on behalf of all others similarly situated, and allege as follows:

## INTRODUCTION

1.    This is a class action lawsuit brought by Plaintiffs on behalf of themselves and a class of current and former owners and lessees of model years 2022-2023 VW Tiguan vehicles (hereinafter referred to collectively as the "Tiguans"

or "Class Vehicles"). VW designed, manufactured, marketed and warranted the Class Vehicles.[1]

2.    This action arises from VW's failure to disclose to Plaintiffs and similarly situated consumers that the Class Vehicles contain a design defect which causes them to consume an excessively high rate of engine oil (the "Oil Consumption Defect" or the "Defect"). As described in more detail below, the Oil Consumption Defect causes the Class Vehicles to prematurely burn off and/or consume abnormal and excessive amounts of engine oil.

3.    The Oil Consumption Defect requires vehicle operators to re-fill or top off their oil at intervals significantly shorter than those set forth by VW. This frequent replenishment of oil requires consumers to incur out of pocket expenses that were not contemplated at the time of purchase. Further, the Oil Consumption Defect can cause unexpected engine stalling and engine failure while the Class Vehicles are in operation at any time and under any driving condition or speed. This exposes the driver and occupants of the Class Vehicles, as well as others who share the road with them, to an increased risk of an accident.

4.    VW has long been aware of the Oil Consumption Defect. Yet, notwithstanding its longstanding knowledge of this problem, VW has routinely

_____

[1] Plaintiffs reserve the right to amend or add to the vehicle models included in the definition of Class Vehicles after conducting discovery.

refused to adequately repair the Class Vehicles without charge when the Defect manifests. VW has even refused to acknowledge the Oil Consumption Defect's existence when Class Vehicles displaying symptoms consistent with the Defect are brought in for service, instead telling consumers that nothing is wrong with their car.

5.    As a result of VW's unfair, deceptive and/or fraudulent business practices, owners and/or lessees of the Class Vehicles, including Plaintiffs, have suffered an ascertainable loss of money and/or property and/or loss in value. Had Plaintiffs and Class Members known about the Oil Consumption Defect at the time of their purchase or lease transaction, they would not have purchased or leased the Class Vehicles or they would have paid substantially less for them.

6.    As a direct result of VW's wrongful conduct, Plaintiffs and Class Members have been harmed and are entitled to actual damages, including damages for the benefit of the bargain they struck when purchasing their vehicles, the diminished value of their vehicles, statutory damages, compensatory damages, attorneys' fees, costs, restitution, and injunctive and declaratory relief.

7.    Accordingly, Plaintiffs bring this action to redress VW's violations of the Pennsylvania Unfair Trade Practices and Consumer Protection Law and Maryland Consumer Protection Act, and also seeks recovery for VW's breach of implied warranty, breach of express warranty and, in the alternative, for unjust enrichment.

## JURISDICTION AND VENUE

8.      This Court has subject matter jurisdiction of this action pursuant to 28 U.S.C. § 1332(d), the Class Action Fairness Act of 2005, because: (i) there are 100 or more class members, (ii) there is an aggregate amount in controversy exceeding $5,000,000, exclusive of interest and costs, and (iii) there is minimal diversity because plaintiff and defendant are citizens of different States.

9.      Venue properly lies in this District and vicinage pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District. Additionally, VW conducts a substantial amount of business in this District, is incorporated in this District, and subject to personal jurisdiction in this District, and therefore is deemed to be a citizen of this District.

## PARTIES

**Plaintiff Stacy Zeiders**

10.     Plaintiff Stacy Zeiders is a resident and citizen of Leland, North Carolina. At the time of purchase, Plaintiff Zeiders was a resident and citizen of Pennsylvania. She purchased a 2022 Volkswagen Tiguan (VIN: 3VV2B7AX6NM157027) in September 2021 from Faulkner Volkswagen Mechanicsburg in Mechanicsburg, Pennsylvania.

11.     Plaintiff Zeiders researched the vehicle on VW's website, reviewed VW marketing and promotional materials available at the dealership, and spoke with

VW sales representatives before purchasing the Class Vehicle. Plaintiff Zeiders also reviewed the vehicle's Monroney sticker prior to purchase.

12.     In or about October of 2021, Plaintiff Zeiders noticed hesitation and lack of power with the vehicle coinciding with a sputtering noise emitting from the vehicle's engine. Following these incidents, Plaintiff Zeiders brought her vehicle into the Mechanicsburg dealership for further inspection. The dealership determined that vehicle had been safe to drive and that the issues Plaintiff Zeiders indicated are normal occurrences with the Vehicle. Plaintiff Zeiders continued to experience these incidents.

13.     In or about March of 2024, following a routine service and inspection of Plaintiff's vehicle (which included an oil change), Plaintiff Zeiders noticed the oil light come on. Plaintiff Zeiders was required to purchase oil and fill her vehicle's oil pan with an additional 1.5 liters.

14.     In or about August of 2024, following Plaintiff Zeiders' move to North Carolina, she delivered her vehicle to Carolina Volkswagen in Charlotte, North Carolina for another full-service inspection, also including an oil change. Within six weeks, Plaintiff grew concerned about her vehicle's oil levels and checked it herself, even though the oil level warning had not turned on. Despite this, Plaintiff discovered that her oil level was significantly low and once again she needed to fill her oil pan with 2 additional liters of oil.

15.    Plaintiff Zeiders experienced the excessive Oil Consumption Defect again in mid-October 2024, when she was required to fill her Vehicle's oil pan with additional oil.

16.    On November 22, 2024, Plaintiff Zeiders experienced the excessive Oil Consumption Defect once again, requiring her to fill her Vehicle with an additional quart of oil. Following this visit, the North Carolina dealership suggested that Plaintiff's vehicle undergo VW's oil consumption exam. Plaintiff's vehicle has undergone Phase One of the oil consumption exam and will return her Vehicle following completion of Phase Two in which Plaintiff is required to drive her Vehicle equipped with the Defect for 600 miles.

17.    Plaintiff had communicated with the North Carolina Volkswagen dealership on multiple occasions following these incidents. The dealership was unable to provide Plaintiff with proper assistance or remedy.

18.    At all times relevant herein, Plaintiff Zeiders adhered to VW's recommended maintenance intervals.

19.    Due to the Oil Consumption Defect, and other issues potentially arising as a result of the Defect, such as the engine sputtering issue, Plaintiff Zeiders has concerns with the safety of driving her vehicle. Plaintiff Zeiders relies on her vehicle for her profession and is concerned that the Oil Consumption Defect could impact the safety of the vehicle, cause her to end up stranded somewhere, or that she will

have to rely on her own intuition to check the Vehicle's oil level because the oil level warning light has failed to warn Plaintiff of low oil levels in the past.

20.    Plaintiff Zeiders has suffered an ascertainable loss as a result of Defendant's omissions and/or misrepresentations associated with the Oil Consumption Defect, including, but not limited to, out-of-pocket losses associated with the Oil Consumption Defect, diminished value of her vehicle, and other consequential damages. Namely, Plaintiff Zeiders spent approximately $360 in out-of-pocket expenses, such as vehicle servicing, oil changes, and the purchase of oil cannisters to keep in her vehicle should the issue continue to arise.

21.    Neither VW, nor any of its agents, dealers, or other representatives, informed Plaintiff Zeiders of the existence of the Oil Consumption Defect prior to her purchase.

**Plaintiff Calvin Westlund**

22.    Plaintiff Calvin Westlund is a resident and citizen of Salisbury, Maryland. He purchased a 2022 Volkswagen Tiguan R-Line Black Edition (VIN: 3VV8B7AX5NM135918) in September 2022 from Pohanka Volkswagen in Salisbury, Maryland.

23.    Plaintiff Westlund researched the vehicle on VW's website, reviewed VW marketing and promotional materials available at the dealership, and spoke with

VW sales representatives before purchasing the Class Vehicle. Plaintiff Westlund also reviewed the vehicle's Monroney sticker prior to purchase.

24.     In or about December of 2023, Plaintiff Westlund noticed the low oil light come on. Plaintiff Westlund promptly brought his vehicle into the dealership to fill his vehicle's oil pan with oil. The Pohanka dealership did not indicate that there was any problem with the vehicle.

25.     In or about March or April of 2024, Plaintiff Westlund experienced the Defect again. He brought his car back to the dealership, where it filled his vehicle with additional oil, and communicated that nothing out of the ordinary was observed when inspecting his vehicle.

26.     This Defect became more persistent. Plaintiff Westlund has had to fill his oil two additional times in November 2024, and then three additional times in December 2024, to-date. Plaintiff Westlund did not drive his car excessively during this period. Most recently, Plaintiff experienced the Defect on December 10, 2024, at which time he promptly brought his vehicle in to be filled up with oil. During this visit, despite this having been the fourth or fifth time he had to fill up his oil over the past month, the dealership tried to assure Plaintiff Westlund that this was a "normal" occurrence. Plaintiff Westlund brought the vehicle back the following day on December 11, 2024, after experiencing the Defect once again. The Pohanka

dealership filled his vehicle additional oil and began Phase One of VW's oil consumption exam, which is currently in progress.

27.    Plaintiff had communicated with the Pohanka Volkswagen dealership on multiple occasions following these incidents, yet the dealership has been unable to provide Plaintiff with proper assistance or remedy.

28.    Plaintiff Westlund also began experiencing additional vehicle issues potentially related to the effects of his vehicle's Oil Consumption Defect. Since December 2023, Plaintiff has experienced pedal delay and subsequent jerking of the vehicle. This issue has become more persistent with time.

29.    Due to the Oil Consumption Defect, and other issues potentially resulting from the Defect, Plaintiff Westlund is concerned about the reliability and safety of driving his Vehicle. Plaintiff Westlund has expressed explicit concern with the possibility that his vehicle will shut down due to the Defect and that the low oil level warning light does not provide an accurate indication of the current level of the oil.

30.    At all times relevant herein, Plaintiff Westlund adhered to VW's recommended maintenance intervals.

31.    Plaintiff Westlund has suffered an ascertainable loss as a result of Defendant's omissions and/or misrepresentations associated with the Oil Consumption Defect, including, but not limited to, out-of-pocket losses associated

with the Oil Consumption Defect, diminished value of his vehicle, and other consequential damages. Namely, Plaintiff spent approximately $35 in out-of-pocket expenses, such as the purchase of oil cannisters to keep in his vehicle should the issue continue to arise.

32.    Neither VW, nor any of its agents, dealers, or other representatives informed Plaintiff Westlund of the existence of the Oil Consumption Defect prior to his purchase.

**Defendant**

33.    Defendant Volkswagen Group of America, Inc. is a New Jersey corporation with its headquarters and its principal place of business at 1950 Opportunity Way, Suite 1500, Reston, Virginia 20190. VW coordinates the United States operations and activities of the Volkswagen, Audi, Bentley, Bugatti, and Lamborghini brands, as well as the activities of its 10,000 employees and its subsidiaries, VW Credit, Inc. and U.S. Volkswagen Group of America Chattanooga Operations, LLC, the latter of which manufacturers Volkswagen-branded vehicles.

## FACTUAL ALLEGATIONS

### A.    The Oil Consumption within the Class Vehicles

34.    VW designs, engineers, manufactures and sells vehicles through its network of authorized motor vehicle dealers.

35.    Since VW's Tiguan entered the market in 2007, almost 1 million Tiguans have been sold in the United States.[2]  VW has shared that since 2018, the Tiguan has been the bestselling Volkswagen.[3]

36.    The 2.0L engine, which VW used in the Class Vehicles, is a 2.0-liter engine that was manufactured by Defendant VW.

37.    The engines in the Class Vehicles have an engine oil capacity of 5 quarts.[4]

38.    According to Defendant, each Class Vehicle contains a smart oil monitor that gauges how much oil is in your engine and illuminates a light on a driver's dashboard when it is ready to be refilled.[5] VW suggests an oil change every 10,000 miles or every year, whichever occurs first.[6]

39.    As background, the engines contained in the Class Vehicles use four reciprocating pistons to convert pressure into a rotating motion. Gasoline is mixed with air in the combustion chambers of the engine. To generate such rotating motion,

---

[2] https://www.goodcarbadcar.net/volkswagen-tiguan-sales-figures/ (last visited Dec. 9, 2024).

[3] https://www.volkswagen-newsroom.com/en/press-releases/new-tiguan-generation-volkswagens-bestseller-celebrates-world-premiere-in-front-of-10000-employees-17655 (last visited Dec. 9, 2024).

[4]    https://www.asburyauto.com/2022-volkswagen-tiguan-oil-change (last visited Dec. 9, 2024).

[5]        https://www.lokeyvw.com/blog/volkswagen-tiguan-service-faq-essential-maintenance-guide/ (last visited Dec. 9, 2024).

[6] https://static.nhtsa.gov/odi/tsbs/2021/MC-10190515-0001.pdf (last visited Dec. 9, 2024).

a four-step sequence is used (the "Combustion Cycle"). First, the intake stroke begins with the inlet valve opening and a vaporized fuel mixture is pulled into the combustion chamber. Second, the compression stroke begins with the inlet valve closing and the piston beginning its movement upward, compressing the fuel mixture in the combustion chamber. Third, the power stroke begins when the spark plug ignites the fuel mixture, expanding the gases and generating power that is transmitted to the crankshaft. Fourth, the exhaust stroke begins with the exhaust valve opening and the piston moving back down, allowing the exhaust gases to escape the cylinder. The exhaust valve then closes, the inlet valve opens, and the Combustion Cycle repeats itself. A diagram of the Combustion Cycle is below:



40.    During this process, engine oil is used to lubricate the piston and cylinder wall as the piston moves up and down through the four-stroke sequence. Engine oil is also necessary in this process to reduce wear on moving parts throughout the engine, improve sealing, and cool the engine by carrying heat away from the moving parts. If there is an insufficient amount of engine oil, the engine will not have the necessary lubrication or cooling, thereby causing premature wear of internal parts, inadequate performance, and/or catastrophic engine failure.

41.    The top sidewall of each engine piston contains rings that, when correctly sized and installed, and when properly tensioned, prevent engine oil from entering the combustion chamber, as well as optimizing compression. On each piston, there are three rings: the top compression ring, the second compression ring, and the oil control ring.

42.    The top compression ring is the top ring, or closest ring to the inlet and combustion gases, and is exposed to the greatest amount of chemical corrosion and the highest operating temperature. The compression ring transfers approximately 70% of the combustion chamber heat from the piston to the cylinder wall.

43.    The second compression ring, also known as the wiper ring, is used to further seal the combustion chamber and to wipe the cylinder wall clean of excess oil. Combustion gases that pass by the top compression ring are stopped by the second compression ring.

44.    The bottom ring, known as the oil control ring, is used to wipe excess oil from the cylinder wall during piston movement and return excess oil through the ring openings and oil drain holes to the engine oil pan. The oil control ring includes two thin rails or running surfaces.

45.    If engine oil is able to pass between any of these piston rings and the surface of the cylinder wall, then the engine oil will enter the combustion chamber of the engine. Once engine oil is in the combustion chamber, it will not only cause a decrease in engine performance, but the engine oil will also be burned off during the Combustion Cycle sequence thereby reducing the overall amount of oil contained in the engine. Furthermore, engine oil in the combustion chamber will also cause a decrease in fuel efficiency, cause carbon deposits to form within the engine, and damage the vehicle ignition and emission components. An exemplar diagram of a piston with these rings is shown below:



46.    Upon information and belief, the piston and piston ring assembly in the Class Vehicles contain a manufacturing defect including, *inter alia*, insufficient piston ring tension, causing them to allow engine oil into the combustion chamber of the engine. As a result, engine oil is not separated from the Combustion Cycle as intended. Instead, engine oil is burned and consumed during the Combustion Cycle. Additionally, and as a result, the crankcase becomes pressurized since gases from the Combustion Cycle are caused to enter the crankcase.

47.    Throughout the Combustion Process, engine oil is pumped from the crankcase, circulated throughout the engine, filtered and then returned to the crankcase to begin the cycle again. To reduce the risk of crankcase contamination and improve vehicle emissions, the positive crankshaft ventilation ("PCV") system

was invented in the early 1960s. The PCV system involves the recycling of these unwanted gases through a valve (the "PCV valve") and circulates them back into the intake manifold, where they are pumped back into the cylinders for another chance at being burned during the combustion cycle. A diagram of a typical PCV system is below:



48.    In the Class Vehicles, the PCV system is inadequate and fails to reduce pressure within the crankcase caused by combustion gases escaping from the combustion chamber, past the piston and oil rings, and into the crankcase. This is because the increased blow-by as a result of the reduced piston and oil control ring tensions in an effort to decrease overall friction within the engine in the hopes of

gaining greater MPG. As a result, this has a direct negative impact on the vehicles durability, life expectancy, performance and emissions.

### B. The Oil Consumption Defect Causes Higher Emissions.

49.     As discussed above, on information and belief, the engine oil control strategy in the Class Vehicles does not work as intended, allowing oil to escape past the oil control and piston rings and enter into the combustion chamber during the Combustion Process. Once in the combustion chamber, oil is burned off rather than returned for further lubrication. This not only causes a decrease in engine performance but also decreases fuel efficiency, causes carbon deposits to form, and can damage the engine and various ignition and emission components.

50.     Optimum cylinder combustion depends on the correct air to fuel ratio in order to provide a near stoichiometric mixture (*i.e.*, the fuel amount is neither excessive nor lacking).[7] The oxygen sensors monitor unburned oxygen in the exhaust gases and send this information to the vehicle's engine control module, which then uses this information to determine if the fuel mixture is rich (too much fuel) or lean (not enough fuel) and adjusts the air/fuel mixture as necessary. The oxygen sensors also measure oxygen levels after the exhaust reacts with the catalytic

---

[7] The stoichiometric mixture for a gasoline engine is the ideal ratio of air to fuel that burns all fuel with no excess air. For gasoline fuel, the stoichiometric air–fuel mixture is about 14.7:1 i.e. for every one gram of fuel, 14.7 grams of air are required.

converter, to help the engine run efficiently and to minimize emissions. The catalytic converters are emissions control devices designed to convert toxic pollutants, contained in exhaust gases, to less toxic pollutants by catalyzing a redox reaction (oxidation or reduction).

51.    While a significant amount of the engine oil is burned within the combustion chamber during the Combustion Process, the remaining unburned oil exits the engine via the exhaust system, including through the catalytic converter. Excess oil entering into the exhaust system causes increases in harmful emissions.

52.    The Oil Consumption Defect can contaminate Class Vehicles' oxygen sensors, catalytic converters, and spark plugs, damaging and causing inefficiency of those parts, and leading to less efficient engines and increased emissions. Contamination can impair the oxygen sensors' accuracy, for example, hampering the catalytic converters and causing the engine to not properly detect emission issues. Likewise, the catalytic converters can become poisoned after engine oil is burned during the combustion cycle. The burnt oil is incorporated into the vehicle's expelled exhaust gases, with the exhaust containing substances that coat the working surfaces of the catalytic converters (encapsulating the catalyst so that it cannot contact and treat the exhaust).

53.    The catalytic converter is the central component to a vehicle's emissions system. Since 1975, all cars and light-duty trucks have come equipped

with when the Clean Air Act standards on harmful emissions came into effect.[8] The catalytic converter converts dangerous compounds produced in the combustion process such as carbon monoxide (CO), unburnt hydrocarbons (HC), and nitrogen oxides (Nox) into less harmful carbon dioxide (CO2), nitrogen (N2), and water (H2O).

54.    A catalytic converter has no moving parts and is designed to last the entire useful life of a vehicle. Pressure pushes exhaust gases through two ceramic honeycomb structures made of heat-resistant clay contained within a stainless-steel case. Each of the channels within the honeycomb structure are lined with precious metals such as platinum, rhodium and palladium that act as catalysts to the conversion process. When carbon monoxide (CO), unburnt hydrocarbons (HC), and nitrogen oxides (Nox) molecules come into contact with the platinum, rhodium and palladium, the molecules are stripped apart and then recombined into less harmful carbon dioxide (CO2), nitrogen (N2), and water (H2O). The honeycomb structure increases surface area for these precious metals to come into contact with the harmful carbon monoxide (CO), unburnt hydrocarbons (HC), and nitrogen oxides (NOx).

55.    If excess oil enters into the catalytic converter, the conversion process is disrupted. Excess oil will coat the working surfaces of the ceramic honeycombs

---

[8] *Automobile Emissions Reduction Efforts in the U.S. – Chronology,* EPA Air and Radiation Office of Mobile Services (1999), http://www.ehso.com/ehshome/auto-emissions_chronol.htm.

so that the platinum, rhodium and palladium cannot react with the toxic exhaust gases. This is called "catalyst poisoning" and causes the vehicle to release higher levels of harmful emissions.

56.    Excess oil in the exhaust system can cause other problems that lead to higher emissions. On both sides of the catalytic converter, O2 sensors monitor the concentration of oxygen in the exhaust gases circled in green in the diagram below. The O2 sensors transmit that data to the Engine Control Unit ("ECU").

57.    The phosphorus in the excess oil will foul the O2 sensor, causing the O2 sensor to degrade or fail. When the O2 sensor is fouled, it will communicate to the vehicle's ECU that the fuel/air mixture circulating through the engine is too lean - meaning that there is too little fuel and too much air in the mixture.

58.    The ECU responds by adding fuel to the fuel/air mixture creating a "rich" fuel mixture ("rich" because there is too much gasoline and too little air). When engines run using a "rich" fuel mixture, fuel economy declines because the engine is receiving more fuel than it can consume during the combustion process.

59.    If the issue is not repaired, the excess fuel will burn when it mixes with oxygen inside the catalytic converter and melts the ceramic honeycomb structures. As a result, the catalytic converter's ability to reduce harmful emissions will be compromised.

60.     When the catalytic converter or O2 sensors are compromised, the Check Engine light should illuminate on the display panel informing the driver of a problem. Upon information and belief, the Class Vehicles fail to provide notice of an issue to the driver. The result is that drivers are left completely unaware that the dangerous Oil Consumption Defect is also causing the Class Vehicles to have an emissions system that is defective, pollutes at levels that exceed the intended levels, and violate state and federal emissions standards.

61.     On January 17, 2006, the EPA issued two final rules related to exhaust emission durability for passenger trucks and other vehicles. Under these rules, truck and engine manufacturers can use one of two methods for testing the exhaust emissions' durability—using a chassis dynamometer to test the vehicles after they have run for a given period of time or using a "bench aging" procedure which involves using extreme heat to test certain components, including the catalytic converters.

62.     In either case, certificate holders must test and certify that the vehicles will comply with EPA emissions standards throughout their "useful life," which is currently defined as 120,000 miles. As the Clean Air Act Handbook describes it, "[t]he demonstration of light-duty vehicle emission durability for purposes of certification consists of two elements: (1) emission deterioration (the extent emissions will increase during the vehicle's useful life); and (2) component

durability (whether emission-related components will operate properly for the useful life of the vehicle)."

63.    As a result, VW knew about the Oil Consumption Defect from the beginning, because they are required to test the Class Vehicles for their useful life, and the Oil Consumption Defect would have manifested itself during those tests.

### C.    VW's Longstanding Knowledge of the Defect

#### 1.    Prior TSBs Demonstrate VW's Longstanding Knowledge of Oil Consumption Issues in its Vehicles

64.    VW is no stranger to the Oil Consumption Defect in the Class Vehicles. In September 2024, VW issued a technical service bulletin ("TSB") regarding excessive oil consumption in VW vehicles ("TSB 2017813/19"), which applies to all VW vehicles produced between 2000-2025, including Class Vehicles, which have been, with the exception of the Routan and ID.4. TSB 2017813/19 is attached hereto as **Exhibit A**.

65.    TSBs are essentially an acknowledgement of a vehicle manufacturer, such as VW, that it has noticed a pattern that is likely indicative of a defect in its vehicle(s) that that produces illegal emissions or could injure drivers and their passengers.[9] In TSBs VW suggests the proper way to repair these known issues. *Id.*

---

[9] https://www.eurocarservice.com/what-is-a-tsb-technical-service-bulletin/#:~:text=Roosevelt%20Way%20NE%2C-,What%20is%20a%20TSB%20(Technical%20Service%20Bulletin)?,that%20doesn't%20close%20properly. (last visited Dec. 9, 2024).

TSBs standardize service throughout VW's agent dealership network, and explicitly are not meant for consumer review. Further, these communications often do not reveal the root cause of a problem, only describe a complaint and a remedy, frequently in terms that a lay person would not understand, and do not disclose the severity or scope across all the vehicles to which the TSB relates.

66.    The Revision Table on TSB 2017813/19 lists previous TSBs issued by VW regarding the Oil Consumption Defect. Ex. A, 1. It appears that the original TSB acknowledging the Oil Consumption Defect was issued in December 10, 2008, and revised versions of the same TSB have been issued periodically to include new models that are released each year.[10] Despite the longstanding issue, VW does not offer a way to solve the problem under the "Product Solution" of its TSBs. *Id.*

67.    TSB 2017813/19 first instructs dealers to inspect the engine for any leaks. If there is not a leak *and* "the customer complains that their engine is apparently consuming oil in excess of the Volkswagen oil consumption standard," then the dealer must complete the three-step "Oil Consumption Test" prescribed in TSB 2017813/19 "**before any repair is carried out.**" Ex. A, 2 (emphasis in original).

68.    For part one of the Oil Consumption Test, the dealer must fill the

---

[10] *Id.*; *see also* https://static.nhtsa.gov/odi/tsbs/2022/MC-10209100-0001.pdf (last visited Dec. 10, 2024).

customer's oil and measure the amount of oil added to the customer's vehicle. *Id.* at 2-3.

69.    For part two, after driving the vehicle for not less than 630 miles, when the customer returns the vehicle to the dealership,  the dealer needs to measure the amount of oil in the vehicle again.[11] *Id.* at 3. If the results of part two of the Oil Consumption Test plan were "within specification no further work is to be performed." *Id.* VW indicates that "Volkswagen oil consumption standard [is] up to 0.5 quarts per 600 miles."  *Id.* at 1.

70.    Part three of the Test should only be performed if the results of part two are "outside of the allowable specification." *Id.* at 3.

71.    For part three, VW instructs dealers that "[b]efore any repairs are performed, a Volkswagen Technical Assistance Center (TACS) case must be opened, and the results of the consumption test, copy of the diagnostic log, and the completed Oil Consumption Measurement Worksheet must be sent for review." *Id.* at 4. TSB 2017813/19 does not provide any information regarding how the Oil Consumption Defect should be resolved. *See generally id.*

72.    Furthermore, TSB 2017813/19 provides that if the "result of the test is that the oil consumption is within the permissible tolerance, another [O]il

---

[11] It is unclear from the language of the TSB as to whether dealers instruct customers to return, or if they only complete part two of the Test if the customer returns on his or her own volition. *Id.* at 3.

[C]onsumption [T]est on the same engine will not be covered under Warranty within the next 25,000 miles." *Id.* at 4.

73.     Upon information and belief, VW has had longstanding knowledge of the Oil Consumption Defect in nearly all of its vehicles, including Class Vehicles and, yet, does not provide any solution for this Defect.

### 2.     Reports to NHTSA and VW's Technical Service Bulletins

74.     The National Highway Traffic Safety Administration ("NHTSA") has received numerous complaints about the Oil Consumption Defect in Class Vehicles. Below is a sampling of a portion of the complaints:

**NHTSA ID Number:** 11508357
**Complaint Date:** February 16, 2023
**Consumer Location:** Ruskin, FL
**Vehicle Identification Number:** 3VV3B7AX3NM******
**Summary of Complaint:**
The [complainant] owns a 2022 Volkswagen Tiguan. The [complainant] stated that while driving at an undisclosed speed, the EPC warning light illuminated. Additionally, the vehicle was consuming an excessive amount of engine oil. The vehicle was towed to the dealer however, the mechanic was unable to duplicate the failure. The manufacturer was made aware of the failure. The failure mileage was approximately 16,000.

**NHTSA ID Number:** 11528046
**Complaint Date:** June 21, 2023
**Consumer Location:** Stockton, NY
**Vehicle Identification Number:** 3VV1B7AX4NM******
**Summary of Complaint**
From a cold start even with warming up the car, I can only drive so many feet before the car begins to hesitate as I proceed. It is as if the transmission cannot respond to the petal. At 25k miles, it is persistently getting worse and will visibly hop as I proceed. Then the transmission will finally remember how to drive[,] and it won't do it again until it sits for a while. I make a left turn from my road where the cars are

going 55mph. It's an accident waiting to happen. Furthermore, it is the same problem that Volkswagen has been having for the previous years. The dealership claims this is what they do. Also[,] that it's normal for my low oil light to come on in between oil changes!

**NHTSA ID Number:** 11542905
**Complaint Date:** September 5, 2023
**Consumer Location:** Orangeburg, NY
**Vehicle Identification Number:** 3VV0B7AX7NM******
**Summary of Complaint:**
I bought this brand new Tiguan in July 2022. The engine is either leaking or burning engine oil. I have the check engine oil level light on around every 2000-3000 miles. I had been to the dealer several times. They just inspect for leak and added engine oil. The problem still exist. The dealer stated that my car needs oil change every 10k miles. I am going back every 2-3 k miles for engine oil. There is something wrong with the engine. It is burning or consuming the engine oil. Another problem [I] have is the wheel or the brakes. When I was braking at above 60 miles per hours, there is a strong vibration on the wheel or brakes.

**NHTSA ID Number:** 11549749
**Complaint Date:** May 8, 2023
**Consumer Location:** Trumbull, CT
**Vehicle Identification Number:** 3VV2B7AX3NM******
**Summary of Complaint:**
Oil light went on in May 2023, at approximately 15K miles, then again in August 2023, at approximately 17,500 miles. Both times the oil was down 1 quart. We have been seeing smoke come out of the exhaust, intermittently. VW service department did an oil consumption test which resulted in the car burning just under a quart of oil after 600 miles. They said the car is functioning normally, but if it burned over a 1/2 quart of oil, they would do something, but not sure what they would do. They have not addressed the "smoke coming out of the exhaust" issue.

**NHTSA ID Number:** 11562466
**Incident Date:** December 28, 2023
**Consumer Location:** Tampa, FL
**Vehicle Identification Number:** 3VV3B7AX4NM******
**Summary of Complaint:**
Car uses lots of oil between oil changes 1 1/2 quart in between suggested change intervals.

**NHTSA ID Number:** 11565944
**Complaint Date:** January 2, 2023
**Consumer Location:** Gaylord, MI
**Vehicle Identification Number:** 3VV2B7AX7NM******
**Summary of Complaint:**

Vehicle has been using oil since it ha[d] approx[iamately] 15k miles. Engine now has 35,000 miles and uses all of its engine oil before its next sched maint[enance]. [I] [h]ave told dealer numerous times, oil consumption test revealed it uses .61 quarts per 1000 miles, but this is normal per VW. What !?!?. VW states to change oil every 10,000 miles, it will be gone and engine will have no oil remaining within the sched sched maint[enance] [period]. Have also contacted VW directly. Also blows blue smoke at start up at times. Engine is junk. Vehicle will have cost over $1000 per mile to own. Dealer and VW keep telling us to just check oil, its normal. I also own a 2003 pontiac vibe with 220k miles, it doesn't do this! I used to be an ASE certified mechanic. This is NOT normal. Car also has the typical hesitation on cold acceleration that is common (look it up), I will file separate complaint. And now p2402 code for an emissions issue. Problems adding up fast and no help from VW or VW dealers.

**NHTSA ID Number:** 11590261
**Complaint Date:** May 3, 2023
**Consumer Location:** Spotsylvania, VA
**Vehicle Identification Number:** 3VV2B7AX2NM******
**Summary of Complaint:**

My vehicle['s] low oil light ca[m]e on and I had just had the oil changed less than 2,000 miles. Took it to local dealership, they stated 2 seals needed to be replaced, they replaced them and stated I should be good but check the oil every so often to make sure. 500 miles goes by I need at least 1 qt of oil, took it back to dealership now they say I need a whole new [h]ead and it is a common problem. They have done about 3-4 in 2024! I feel like that's a safety concern but they don't.

**NHTSA ID Number:** 11591642
**Incident Date:** May 26, 2024
**Consumer Location:** Gallatin, TN
**Vehicle Identification Number:** 3VV1B7AX7NM******
**Summary of Complaint:**

Crankshaft vent valve clogged and failed, causing over[ ]pressurization and oil leaks. Caused the oil pan to crack and upper timing cover to leak per the inspection at Volkswagen. I was driving, going 63mph when it said max engine speed 3000RPM and a light that said EPC started flashing along with the engine light. I turned off

cruise control and began to go towards the shoulder and it shuddered and a large white plumb of smoke came out of it. It wouldn't speed up at all while I was getting over. I had it towed to my home. My husband noticed oil all over the bottom and back of my car. My dipstick had no oil on it at all. We towed it Tuesday morning to Volkswagen.

**NHTSA ID Number:** 11615176
**Complaint Date:** September 6, 2024
**Consumer Location:** Whitehouse, OH
**Vehicle Identification Number:** 3VV2B7AX5NM******
**Summary of Complaint:**
The PVC valve failed on my two-year-old Volkswagen Tiguan at 60,000 miles. As a result, the upper timing gasket was blown, the oil pan went bad, along with several other issues relating to gaskets, seals and sensors, causing an oil leak. This problem was confirmed by my local Volkswagen dealership, and is costing me over $2,000 out-of-pocket. The check engine light was extremely inconsistent - coming on and then going off for days at a time. This is a safety concern. Unfortunately, through research, I have found that many other Tiguan owners are experiencing the same problems, but it does not seem Volkswagen is willing to issue a recall.

**NHTSA ID Number:** 11627427
**Complaint Date:** November 20, 2024
**Consumer Location:** New York, NY
**Vehicle Identification Number:** 3VV8B7AX8NM******
**Summary of Complaint:**
ever since purchasing the car in 2021 I noticed it burns oil very quickly. Every time [I] would bring my car to my local body show before an oil change was do there was always no oil left. I finally brought the car back to VW and they told me it could be the shop was not using the right stuff which [I] knew was not true and they charged me for oil change and told me to come back if the problem continued. Sure enough 6 weeks later the oil light came on. I brought it back to VW and they told me the car has an engine oil consumption issue and they could keep the car from a week to 6 months

75.    VW, through (1) its public acknowledgement of the problem; (2) its

own records of customers' complaints, (3) dealership repair records, (4) records

from the National Highway Traffic Safety Administration (NHTSA), (5) warranty

and post-warranty claims, (6) internal pre-sale durability testing and internal investigations, and (7) other various sources, has always known or should have known of the Oil Consumption Defect in the Class Vehicles. Yet, at no time has VW disclosed these defects to consumers or warned consumers despite knowing the defects persist today with no known way to remediate the existing Class Vehicles.

76.    VW failed to adequately research, test and/or manufacture the Class Vehicles before warranting, advertising, promoting, marketing, and/or selling them as suitable and safe for use in an intended and/or reasonably foreseeable manner.

77.    VW is experienced in the manufacture of consumer vehicles. As an experienced manufacturer, VW conducts tests, including pre-sale durability testing, to verify the vehicles it sells are free from defects and align with VW's specifications and intended use of the Class, including routine highway travel.

78.    Upon information and belief, VW performs durability testing on its vehicles before they are released for sale to the general public.[12]

79.    Through a variety of quality control metrics, VW knew or should have known of the Oil Consumption Defect in the Class Vehicles prior to and shortly after the time of sale to Class Members.

80.    Consumers have incurred and will continue to incur expenses for repair

---

[12]    https://atslab.com/specialty/automotive-components/volkswagen-standards-testing/#:~:text=Some%20of%20the%20VW%20validation,vehicles%20over%20an%20extended%20period. (last visited Dec. 10, 2024).

of engine, should they desire a permanent fix, because the TSB does not adequately resolve the Oil Consumption Defect. This is so despite VW's plain knowledge—for years—of a latent defect contained in the Class Vehicles manufactured by Defendant.

81.    Upon information and belief, Defendant, through (1) its own records of customers' complaints, (2) dealership repair records, (3) warranty and post-warranty claims, (4) internal pre-sale durability testing and internal investigations, and (5) a variety of other sources was well aware of the Oil Consumption Defect.

82.    Despite Defendant's knowledge of the Oil Consumption Defect, it failed to notify customers of the nature and extent of the problems with Class Vehicles or provide any adequate remedy. Defendant continued to sell Class Vehicles with the Oil Consumption Defect through its authorized dealers all over the United States.

83.    VW knew of the Oil Consumption Defect and its associated defects when performing these quality control metrics on the Class Vehicles.

**D.    Warranties Related to the Defect**

84.    The Class Vehicles come with a four-year/50,000-mile Bumper-to-Bumper Warranty.[13] The warranty lasts for four years from the date delivery of the

---

[13] https://www.darcarsvw.com/blogs/3659/whats-included-in-a-2022-new-volkswagen-car-warranty/ (last visited Dec. 10, 2024).

Class Vehicle is taken, or for 50,000 miles on the odometer, whichever occurs first.

85.    The Class Vehicles also come with a four-year/50,000-mile Powertrain Warranty.[14] The Powertrain Warranty covers the transmission, driveshaft, wheels, axles, engine, and anything that makes the car move.[15] Accordingly, the Powertrain Warranty is the applicable warranty related to the Oil Consumption Defect.

86.    VW instructs vehicle owners and lessees to bring their vehicles to a VW dealership for the warranty repairs. Many owners and lessees have presented Class Vehicles to VW dealerships with complaints about the Oil Consumption Defect.

87.    Despite VW's knowledge of the problem—and presumably how to appropriately remediate and prevent the Oil Consumption Defect from recurring—VW refuses to provide appropriate warranty coverage, instead implementing the band-aid TSB and/or informing consumers that the Oil Consumption Defect is normal and oil should be added on a regular basis between oil change intervals, none of which is covered by the warranty nor will it solve the Oil Consumption Defect.

## **TOLLING OF STATUTES OF LIMITATION**

88.    Defendant VW was and remains under a continuing duty to disclose to Plaintiffs and Class Members the true character, quality, and nature of the Class Vehicles, that this defect is based on poor manufacturing, and that it will require

---

[14] *Id.*

[15] *Id.*

continued costly repairs, poses a safety concern, and diminishes the resale value of the Class Vehicles. As a result of the active concealment by VW, any and all applicable statutes of limitations otherwise applicable to the allegations herein have been tolled.

89.    Any applicable statute(s) of limitations has been tolled by VW's knowing and active concealment and denial of the facts alleged herein. Plaintiffs and Class Members could not have reasonably discovered the true, latent defective nature of the Oil Consumption Defect until shortly before this class action litigation was commenced.

## CLASS ALLEGATIONS

90.    Plaintiffs bring this action pursuant to Rules 23(a), 23(b)(2), and 23(b)(3) of the Federal Rules of Civil Procedure, on behalf of themselves and the following proposed classes:

> **Nationwide Class:**
> All persons in the United States who purchased or leased a Class Vehicle.
>
> **Pennsylvania Subclass:**
> All persons who purchased or leased a Class Vehicle in Pennsylvania.
>
> **Maryland Subclass:**
> All persons who purchased or leased a Class Vehicle in Maryland.

91.    Excluded from the Class are VW, its employees, officers, directors, legal representatives, heirs, successors, wholly- or partly-owned, and its subsidiaries and affiliates; VW dealers; proposed Class counsel and their employees; the judicial officers and associated court staff assigned to this case and their immediate family members; all persons who make a timely election to be excluded from the Class; governmental entities; and the judge to whom this case is assigned and his/her immediate family.

92.    <u>Numerosity</u>. Federal Rule of Civil Procedure 23(a)(1): The Class Members are so numerous and geographically dispersed that individual joinder of all Class Members is impracticable. Class Vehicles may be identified during the pendency of this action and all owners and lessors notified by recognized, Court-approved notice dissemination methods, which may include U.S. Mail, electronic mail, Internet postings, and/or published notice. The Class Members may be easily derived from VW's sales records.

93.    <u>Commonality and Predominance</u>. Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3): This action involves common questions of law and fact, which predominate over any questions affecting individual Class Members, including, without limitation:

  a.  Whether VW engaged in the conduct alleged herein;

b. Whether VW designed, advertised, marketed, distributed, leased, sold, or otherwise placed the Class Vehicles into the stream of commerce in the United States;

c. Whether the Oil Consumption Defect constitutes a safety defect;

d. Whether VW knew about, and failed to disclose, the Oil Consumption Defect at the time Plaintiffs and the Class Members purchased their Class Vehicles;

e. Whether VW manufactured, marketed, and distributed the Class Vehicles knowing that the Oil Consumption Defect could and would occur;

f. Whether VW's conduct violates consumer protection statutes, false advertising laws, sales contracts, warranty laws, and other laws as asserted herein;

g. Whether VW owed a duty to warn Plaintiffs and Class Members about the Oil Consumption Defect;

h. Whether Plaintiffs and the other Class Members overpaid for their Class Vehicles;

i. Whether VW breached the warranty by failing to properly inspect and repair the Oil Consumption Defect;

j. Whether Plaintiffs and the other Class Members are entitled to equitable relief, including, but not limited to, restitution or injunctive relief; and

k. Whether Plaintiffs and the other Class Members are entitled to damages and other monetary relief and, if so, in what amount.

94. <u>Typicality</u>. Federal Rule of Civil Procedure 23(a)(3): Plaintiffs' claims are typical of the other Class Members' claims because, among other things, all Class Members were comparably injured through VW's wrongful conduct as described above.

95.    <u>Adequacy</u>. Federal Rule of Civil Procedure 23(a)(4): Plaintiffs are adequate Class representatives because their interests do not conflict with the interests of the other Class Members they seek to represent; Plaintiffs have retained counsel competent and experienced in complex class action litigation; and Plaintiffs intend to prosecute this action vigorously. The interests of the Class will be fairly and adequately protected by Plaintiffs and their counsel.

96.    <u>Declaratory and Injunctive Relief</u>. Federal Rule of Civil Procedure 23(b)(2): VW has acted or refused to act on grounds generally applicable to Plaintiffs and the other Class Members, thereby making appropriate final injunctive relief and declaratory relief with respect to the Class as a whole.

97.    <u>Superiority</u>. Federal Rule of Civil Procedure 23(b)(3): A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiffs and the other Class Members are relatively small compared to the burden and expense that would be required to individually litigate their claims against VW, so it would be impracticable for the Class Members to individually seek redress for VW's wrongful conduct. Even if Class Members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments, and increases the delay and expense to all

parties and the court system. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## VIOLATIONS ALLEGED

### FIRST CAUSE OF ACTION
### VIOLATIONS OF PENNSYLVANIA'S UNFAIR TRADE PRACTICES ACT
### 73 Pa. Stat. Ann. § 201-1, *et seq*.
(On Behalf of the Pennsylvania Subclass)

98.    Plaintiff Zeiders and the Pennsylvania Subclass incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

99.    Plaintiff Zeiders brings this claim on behalf of herself and on behalf of the Pennsylvania Subclass Members against Defendant.

100.    Plaintiff Zeiders and Pennsylvania Subclass Members are natural persons who purchased or leased a Class Vehicle for personal, family or household purposes.

101.    The Pennsylvania Unfair Trade Practices and Consumer Protection Law ("PUTPCPL") prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce" as set forth in the statute. 73 Pa. Stat. § 201-3.

102.    Defendant engaged in unfair and deceptive acts in the conduct of trade or commerce in violation of the PUTPCPL by the practices described above, and by knowingly and intentionally concealing from Plaintiff Zeiders and Subclass

Members that the Class Vehicles suffer from the Oil Consumption Defect (and the costs, risks, and diminished value of the vehicles as a result of this problem). These acts and practices violate, at a minimum, the following subsections of PUTPCPL, Section 201-2:

> (4)(ii) Misrepresenting the source, sponsorship, approval or certification of goods or services;

> (4)(v) Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation or connection that he does not have;

> (4)(vii) Representing that goods or services are of a particular standard, quality or grade, or that goods are of a particular style or model, if they are of another;

> (4)(ix) Advertising goods and services with intent not to sell them as advertised; and

> (4)(xxi) Engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding.

103.    Defendant knew that its Class Vehicles suffered from the Oil Consumption Defect, would fail prematurely, and were not suitable for their intended use.

104.    Defendant was under a duty to Plaintiff Zeiders and the Pennsylvania Subclass to disclose the defective nature of the Class Vehicles because:

> a.    Defendant was in a superior position to know the true state of facts about the Defect in the Class Vehicles;

b. Plaintiff Zeiders and the Pennsylvania Subclass could not reasonably have been expected to learn or discover that the Class Vehicles were defective and not in accordance with Defendant's advertisements and representations;

c. The Defect is a safety related Defect; and

d. Defendant knew that Plaintiff Zeiders and the Pennsylvania Subclass could not reasonably have been expected to learn or discover the Defect in the Class Vehicles.

105.   In failing to disclose the Defect and the associated safety risks and repair costs that result from it, Defendant has knowingly and intentionally concealed material facts and breached their duty not to do so.

106.   The facts concealed or not disclosed by Defendant to Plaintiff Zeiders and the Pennsylvania Subclass Members are material in that a reasonable consumer would have considered them to be important in deciding whether to purchase Defendant's Class Vehicles or pay a lesser price. Had Plaintiff Zeiders and the Pennsylvania Subclass known about the defective nature of the Class Vehicles, they would not have purchased the Class Vehicles, would have paid less for them, or would have avoided the extensive repair costs associated therewith.

107.   Unfair or deceptive acts and practices as defined by the PUTPCPL also include "[f]ailing to comply with the terms of any written guarantee or warranty

given to the buyer at, prior to or after a contract for the purchase of goods or services is made." 73 Pa. Stat. § 201-2(4)(xiv). Defendant violated the PUTPCPL by refusing to repair Plaintiffs' Class Vehicles and at no cost to pursuant to the terms of the New Vehicle Limited Warranty and/or Powertrain Warranty applicable to all Class Vehicles.

108.   Defendant's failure to honor its warranty terms proximately caused injuries to Plaintiff Zeiders and the Pennsylvania Subclass. Had Defendant honored its' warranty, Plaintiff Zeiders and the Pennsylvania Subclass would not have incurred substantial repair costs.

109.   Pursuant to 73 Pennsylvania Statutes, Section 201-9.2, Plaintiffs request that the Court grant treble damages.

**SECOND CAUSE OF ACTION**
**VIOLATIONS OF MARYLAND CONSUMER PROTECTION ACT**
**Md. Code Com. Law § 13-101, *et seq.***
(On Behalf of the Maryland Subclass)

110.   Plaintiff Westlund and the Maryland Subclass incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

111.   Plaintiff Westlund brings this claim on behalf of himself and on behalf of the Maryland Subclass Members against Defendant.

112.   The Maryland Consumer Protection Act ("MCPA") was created to protect Maryland consumers from unfair, abusive, and/or deceptive trade practice trade practices.

113.   Plaintiff Westlund and Maryland Subclass Members purchased or leased a Class Vehicle for personal, family or household purposes.

114.   Defendant marketed and advertised the Class Vehicles to consumers in Maryland. In addition, Defendant, among other things, sold the Class Vehicles in Maryland, shipped Class Vehicles to Maryland, and otherwise engaged in trade or commerce, or conducted business, related to the Class Vehicles in Maryland.

115.   As set forth more fully above, Defendant marketed and sold the Class Vehicle as safe, fully functioning vehicles, without any defects that could cause them to consume excessive amounts of oil. While selling and profiting from the Class Vehicles, Defendant knew that the Class Vehicles were defective in that they would require continued costly repairs, poses a safety concern, and diminishes the resale value. Defendant intentionally concealed this material information from consumers because to do otherwise would have resulted in purchasers and/or leasers seeking safer alternatives that otherwise required few costly repairs and better retained their resale values.

116.   Defendant concealed and failed to disclose in any of its marketing materials, advertising, Monroney stickers, and/or any other communication that the Class Vehicles were defective and would require continued costly repairs, pose a safety concern, and have diminished resale value. This material omission was unfair,

fraudulent, abusive, and/or deceptive standing alone and was particularly deceptive in light of the fact that the Class Vehicles were sold as breathing assistance devices.

117.    Defendant's conduct constitutes the act, use or employment of deception, false promise, misrepresentation, unfair practice and the concealment, suppression, and omission of material facts in connection with the sale and advertisement of merchandise, the Class Vehicles, in trade or commerce in Maryland, making it unlawful under Md. Code Com. Law § 1301, *et seq*.

118.    Defendant's conduct constituted, among other things, the following prohibited unfair, abusive, or deceptive trade practices: (a) misrepresenting material facts about the nature of the Class Vehicles have characteristics, uses, or benefits, which they do not have; (b) misrepresenting that the Class Vehicle are of a particular standard, quality, or grade, or that goods are of a particular style or model, when they are not; (c) failure to state a material fact if the failure deceives or tends to deceive; (d) advertisement or offer of consumer goods, consumer realty, or consumer services without intent to sell, lease, or rent them as advertised or offered; (e) deception, fraud, false pretense, false premise, misrepresentation, knowing concealment, suppression, or omission of any material fact with the intent that a consumer rely on the same; and/or (f) engaging in fraudulent and deceptive conduct as described herein.

119.    Defendant's conduct was unfair, fraudulent, abusive, and/or deceptive because the omissions created a likelihood of confusion and misunderstanding and had the capacity or tendency to deceive and, in fact, did deceive, ordinary consumers, including Plaintiff Westlund. Ordinary consumers, including Plaintiff Westlund, would have found it material to their purchasing decisions that the Class Vehicles have the Oil Consumption Defect that would require continued costly repairs, poses a safety concern, and diminishes the resale value. Knowledge of those facts would have been a substantial factor in Plaintiff Westlund's, as well as other Maryland Subclass Members' decision to purchase or lease the Class Vehicle.

120.    Defendant owed Plaintiff Westlund and Maryland Subclass Members, among others, a duty to disclose these facts because they were known and/or accessible exclusively to Defendant (along with potentially other unnamed parties who are not Plaintiff Westlund or Maryland Subclass Members) who had exclusive and superior knowledge of the facts; because the facts would be material to reasonable consumers; because Defendant actively concealed them; because Defendant intended for consumers to rely on the omissions in question; and because the Class Vehicles pose an unreasonable risk of substantial bodily injury.

121.    Plaintiff Westlund and Maryland Subclass Members justifiably relied on the material misrepresentations and/or omissions by Defendant, and reasonable consumers would have been expected to rely upon these representations and/or

omissions, in part, because they are representations and/or omissions that impact seriously on a consumer's safety and finances.

122.   Defendant's conduct actually and proximately caused loss of money or property to Plaintiff Westlund (as set forth above) and Maryland Subclass Members. Absent Defendant's unfair, deceptive and/or fraudulent conduct, Plaintiff Westlund and Maryland Subclass Members would have behaved differently and would not have purchased or leased the Class Vehicle. Defendant's omissions induced Plaintiff Westlund and Maryland Subclass Members to purchase or lease the Class Vehicle, which they would not otherwise have done. Plaintiff Westlund and the Maryland Subclass Members acted as reasonable consumers would have acted under the circumstances, and Defendant's unlawful conduct would cause reasonable persons to enter into the transactions (purchasing or leasing the Class Vehicle) that resulted in the damages.

123.   Accordingly, pursuant to Md. Code Com. Law § 1301, *et seq.*, Plaintiff Westlund and Maryland Subclass Members are entitled to recover their actual damages, which can be calculated with a reasonable degree of certainty using sufficiently definitive and objective evidence. Those damages are: damages for the benefit of the bargain they struck when purchasing their vehicles; the diminished value of their vehicles; the cost of repairs associated with the Defect; and other miscellaneous incidental and consequential damages. In addition, given the nature

of Defendant' conduct, Plaintiff Westlund and Maryland Subclass Members are entitled to all available statutory, exemplary, treble, and/or punitive damages and attorneys' fees based on the amount of time reasonably expended and equitable relief necessary or proper to protect them from Defendant' unlawful conduct.

## THIRD CAUSE OF ACTION
## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
(on behalf of the Nationwide Class and, alternatively
the Pennsylvania and Maryland Subclasses)

124.  Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

125.  VW manufactured and distributed Class Vehicles throughout the United States for sale to Plaintiffs and the Class Members.

126.  VW impliedly warranted to Plaintiffs and Class Members that their Class Vehicles were free of defects and were merchantable and fit for their ordinary purpose for which such goods are used.

127.  As alleged herein, VW breached the implied warranty of merchantability because the Class vehicles suffer from the Oil Consumption Defect. The Class Vehicles are therefore defective, unmerchantable, and unfit for their ordinary, intended purpose.

128.  After Plaintiffs experienced the Oil Consumption Defect and contacted the dealership on multiple occasions without relief, Plaintiffs gave reasonable and

adequate notice to VW that the Class Vehicles were defective, unmerchantable, and unfit for their intended use or purpose.

129.    Due to the Oil Consumption Defect, Plaintiffs and the members of each of the Classes are unable to operate their vehicles as intended in a safe condition, substantially free from defects. The Class Vehicles do not provide safe and reliable transportation to Plaintiffs and the Class Members. As a result, Plaintiffs and Class Members are unable to safely drive their Class Vehicles.

130.    Plaintiffs did not receive or otherwise have the opportunity to review, at or before the time of sale, the written warranty containing the purported exclusions and limitations of remedies. Accordingly, any such exclusions and limitations of remedies are unconscionable and unenforceable, and Plaintiffs are entitled to all remedies available under Article 2 of the Uniform Commercial Code and other state laws of each Class. Any purported warranty disclaimers, exclusions, and limitations were unconscionable and unenforceable. As a direct and proximate result of the breach of implied warranty of merchantability, Plaintiffs and Class Members have been injured in an amount to be proven at trial.

## FOURTH CAUSE OF ACTION
## BREACH OF EXPRESS WARRANTY
(on behalf of the Nationwide Class and, alternatively
the Pennsylvania and Maryland Subclasses)

131.    Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

132.    VW provided all purchasers and lessees of the Class Vehicles with the same express warranties described herein, which became part of the basis of the bargain.

133.    The parts affected by the Oil Consumption Defect were distributed by Defendant in the Class Vehicles and are covered by the warranties VW provided to all purchasers and lessors of Class Vehicles.

134.    Defendant breached these warranties by selling and leasing Class Vehicles with the Oil Consumption Defect, requiring repair or replacement within the applicable warranty periods, and refusing to honor the warranties by providing free repairs or replacements during the applicable warranty periods.

135.    As a direct and proximate cause of VW's breach, Plaintiffs and the Class Members bought or leased Class Vehicles they otherwise would not have, overpaid for their vehicles, did not receive the benefit of their bargain, and their Class Vehicles suffered a diminution in value. Plaintiffs and the Class have also incurred and will continue to incur costs related to the diagnosis and repair of the Oil Consumption Defect.

136.    VW's attempt to disclaim or limit these express warranties is unconscionable and unenforceable under the circumstances here.

137.    Specifically, VW's warranty limitation is unenforceable because it knowingly sold a defective product without informing consumers about the defect.

138. The time limits contained in VW's warranty period were also unconscionable and inadequate to protect Plaintiffs and Class Members. A gross disparity in bargaining power existed between VW and the Class Members, and Defendant knew or should have known that the Class Vehicles were defective at the time of sale and would fail well before their useful lives.

139. Plaintiffs and the Classes have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of VW's conduct described herein.

**FIFTH CAUSE OF ACTION**
**UNJUST ENRICHMENT**
(on behalf of the Nationwide Class and, alternatively
the Pennsylvania and Maryland Subclasses)

140. Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

141. This claim is pled in the alternative to Plaintiffs' contract-based claims.

142. VW knew or should have known that Plaintiffs and the Class paid for the Class Vehicles with the expectation that they would perform as represented and were free from defects.

143. Plaintiffs and the Class conferred substantial benefits on VW by purchasing the defective Class Vehicles. VW knowingly and willingly accepted and enjoyed those benefits.

144. VW's retention of these benefits is inequitable.

145.   As a direct and proximate cause of VW's unjust enrichment, Plaintiffs and the Class are entitled to an accounting, restitution, attorneys' fees, costs and interest.

## **REQUEST FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of Class Members defined above, respectfully request that the Court enter judgment against VW and award the following relief:

A.     Certification of this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, declaring Plaintiffs as the representative of the Classes, and Plaintiffs' counsel as counsel for the Classes;

B.     An order awarding declaratory relief and temporarily and permanently enjoining VW from continuing the unlawful, deceptive, fraudulent, and unfair business practices alleged in this Complaint;

C.     Appropriate injunctive and/or declaratory relief, including, without limitation, an order that requires Defendant to repair, recall, and/or replace the Class Vehicles and to extend the applicable warranties to a reasonable period of time, or, at a minimum, to provide Plaintiffs and Class Members with appropriate curative notice regarding the existence and cause of the Oil Consumption Defect;

D.     An award of appropriate damages to repair or replace the Class Vehicles;

E.    A declaration that VW is financially responsible for all Class notice and the administration of Class relief;

F.    An order awarding any applicable statutory and civil penalties;

G.    An order requiring VW to pay both pre- and post-judgment interest on any amounts awarded;

H.    An award of costs, expenses, and attorneys' fees as permitted by law; and

I.    Such other or further relief as the Court may deem appropriate, just, and equitable.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a jury trial for all claims so triable.

DATED: December 16, 2024          Respectfully submitted,

By:_____

    Benjamin F. Johns
    NJ Bar ID No. 038182005
    Samantha E. Holbrook
    NJ Bar ID No. 034162011
    Andrea L. Bonner
    NJ Bar ID No. 384212022
    **SHUB & JOHNS LLC**
    Four Tower Bridge
    200 Barr Harbor Drive
    Suite 400
    Conshohocken, PA 19428
    T: (610) 477-8380

bjohns@shublawyers.com
sholbrook@shublawyers.com
abonner@shublawyers.com

*Attorneys for Plaintiffs and the Proposed
Class*